• Nott, J.,
delivered the opinion of the court:
This is an action brought to recover $18,866 for salary as consul at Algiers. The facts in the case are that the claimant was appointed consul at Algiers in 1854. He held the office for five years, and then resigned. During this .period he preferred no claim for salary, nor did he at the time of his resignation, nor at any other time so far as we know until July, 1865, when he addressed a letter to the present Secretary of State. It further appears that he made no return of his consular fees, as consuls receiving a salary are bound to do that he received and accepted the necessary expenses of his office allowed to consuls having no salary, and that he was marked in the official list of the State Department as one allowed “ to transact business.” Finally it appears that his immediate predecessor received no salary, and that Congress had ceased to appropriate money for the salary as long ago as 1833, and that from the time Algiers became a French *157 province (1830) tbe Department of State bad discontinued tbe payment of tbe salary.
Tbe reasons for tbis action of tbe government are thus clearly set forth by tbe Secretary of State in bis answer to tbe application of tbe claimant:
“Department-of State,
“ Washington, July 22, 1865.
“ Sir : In reply to your communication of the 14th instant I have to inform you that tbe act of Congress of May 1,1810, prohibiting the President of tbe United States from allowing ‘ to any consul who shall be appointed to reside at Algiers a greater sum than at the rate of $4,000 per annum,’ was intended to apply to that consulate only while Algiers was an independent state.
“ It is held by tbis department that, upon Algiers becoming a dependency of France, tbe necessity for tbe payment of a-salary to a United States consul at that port no longer existed, and tbe same was therefore discontinued.
“ Tbe change in tbe government of Algiers having transpired prior to tbe appointment of your client as consul at that port, Congress having neglected to make appropriations to meet tbe payment of a salary to such officer, which it is presumed was known to your said client, and there being nothing obligatory in tbe act referred to requiring tbe ‘ payment ’ of any salary whatever to tbe incumbent of said office, tbe claim presented by you cannot be allowed.
“ I am, sir, your obedient servant,
“William H: Seward.
“ G-eo. H. Kingsbury, Esq.,
“ 46 Court street, Boston, Massachusetts.”
The claimant, nevertheless, comes into tbis court and insists that he is entitled to tbe salary, and be bases his claim upon tbe language of tbe act of May 1, 1810, (2 Stat. L., p. 608, sec. 1:) “Tbe President shall not allow * * * to any consul who shall be appointed to reside at Algiers a greater sum than at tbe rate of #4,000 per annum as a compensation for all bis personal services and expenses.”
Assuming that this act fixes tbe rate of compensation, and bearing in mind that there was no subsequently repealing or modifying act until those of March 1, 1865, (10 Stat. L., p. 619,) and August 18, 1856, (11 Stat. L., p. 52,) tbe question is, did tbis statute give a salary of #4,000 per annum to tbe claimant, notwithstanding tbe changed cir *158 cumstances under which he accepted the office, and the manifest intent of the parties that no such salary should he charged or received 1
We think that it did not, and the answer to the petition may be placed on several grounds :
I. The act of 1810 did in terms refer to “Algiers,” and was not repealed either expressly or by necessary implication, yet nevertheless a change occurred which rendered so much of the act inoperative. The statute may not have been repealed, but this much of the subject-matter expired. The office and duties of a consul depend more upon treaties and the relations of his government with the foreign power to which he is sent than upon geographical locality. There also has been a marked distinction always between consuls in Christian and in Mohammedan countries. Thus the “ United States Consular Regulations” of 1867 lay it down as to the Mohammedan governments of Tripoli, Morocco, Muscat, and Brunai that “ it may be assumed in regard to them as a principle of the international law of the world, so far as there is any, that unless there be an express agreement to the contrary no Christian nation admits a full reciprocity of municipal rights as between itself and any state not Christian; and therefore that in the Mohammedan governments above enumerated Americans possess therights of exterritoriality which belong to all other‘Franks.’” (p. 127.) Those consuls were accordingly charged with other duties than those commercial agents who superintend and watch over our commerce in European countries, and were invested by treaties with certain diplomatic, and even judicial, powers (treaty with Algiers, 8 Stat. L., p. 244) that were in no degree-awarded to the consuls of the United States resident in France. The consuls to the Mohammedan states were also inhibited from commercial transactions, and were to devote their time to the duties of their office, (2 Stat. L., p. 609, sec. 5,) while the consuls to France were allowed to engage in business. (Convention 1788, 8 Stat. L., p. 106 ; and convention February 28, 1853, 10 Stat. L., p. 992.)
A distinction was accordingly made in their compensation, for to the consulate at Algiers was attached a fixed salary of $4,000 per annum, which was to cover all expenses, while to the others were given only their fees and certain actual expenses of the office.
Now the Algiers to which the act of 1810 refers was not simply a geographical place, but was a Mohammedan power which the United States by no means placed on equality with those of Christendom. This is apparent from all the provisions of the act and from its title, which runs, “An act fixing the compensation of public ministers and *159 of consuls residing on the coast of Barbary,” and which says in immediate context with this provision fixing the salary of the consul at Algiers, “nor to any other consul who shall be appointed to reside at any other of the states on the coast of Barbary a greater sum than at the rate of $2,000 per annum,” (sec. 1;) so the whole statute will be found to refer to “ the Barbary poteers,” (secs. 4 and 6,) “ the states on the coast of Barbary,” (sec. 5,) &c., &c.
The consuls in France, on the contrary, were mere commercial agents under the conventions of 1788 (8 Stat. L., p. 106) and 1853, (10 id., p. 992.) They had no fixed salary, hut merely the fees which they might collect, but they had the right to transact business forbidden to the consuls within the Barbary States.
When Algiers passed to France nearly all of the powers and duties prescribed by the act which authorized the salary of the consul, the act of 1810, ceased; and the office of consul within the contemplation of that act to all intents and purposes expired. The political power of Algiers with which we made treaties and to which we had sent consuls was stricken out of existence. Its territory remained upon the surface of the earth, and its name continued to be borne upon the map; but in a political and diplomatic sense it was no longer Algiers, but France. The consulate there also ceased in point of fact, and from 1831 to 1835 our representatives there went by the name of commercial agents, which was the name given them by the treaty with France of 1800, (8 Stat. L., p. 182, art. X.) We therefore think that, although the cession or conquest of a foreign country cannot, as was said by the counsel for the claimant, repeal an act of Congress, yet nevertheless the subject-matter of the act might expire and the act to this extent become inoperative. In other words we think that the office which the claimant held was not the office to which the salary given by the act of 1810 attached, but that of commercial representative, such as existed by law and usage within the territory and province of France. If on the conquest of Algeria France had changed the name of the new province and Algiers had been plainly designated as a part of France, and the new consul had been accredited to the new country, it would be evident that the commercial agent of the United States did not come within the meaning of the act of 1810 either in name or substance, and was subject to none of its restrictions. nor entitled to any of its benefits. A mere accident of name cannot affect the operation of the statute.
II. In the second place it may be answered to the petition that the parties to this contract thus mutually construed it. There is a class *160 of cases running through the decisions of the Supreme Court wherein it is held that a public officer is entitled to whatever fees or salary the law gives him, notwithstanding the usage which may have existed or his supposed acquiescence in the construction placed upon the act. The reason for this rule was given by Mr. Justice Story in the case of The United States v. Dickson, (15 Peters,p. 161:) “The construction given to the laws by any department of the executive government is necessarily ex parte, without the benefit of an opposing argument, in a suit where the very matter is in controversy; and,when the construction is once given, there is no opportunity to question or revise it by those who are most interested in it, as officers deriving their salary and emoluments therefrom, for they cannot bring the case to the test of a judicial decision. It is only’when they are sued by the government for some supposed default or balance that they can assert their rights.”
But in the case at bar there was something more than the construction given by a “ department of the executive government,” for not only did the Department of State place that construction upon the statute as affected by the existing facts, but the legislative department thus construed it by ceasing to make appropriations for the salary. It is true, as we held in Hannibal Graham’s case, (1 C. Cls. R., p. 380,) that “ an employé of the government is entitled to the salary allowed by law and is not limited by the amount appropriated by Congress,” but that is where the law gives the salary, and not where the action of Congress gives an interpretation to the defendants’ understanding of the law. Such a construction by one party would bind the other if he also thus construed it, and acted upon and in pursuance of the construction jointly given. We have held repeatedly that the “ rule and principle adopted by this court for the administration of justice between a claimant and the government is simply to give that measure of relief which the law would award were the action between man and man.” Curtis’s case, 2 C. Cls. R., p. 144. And the question is here, whether if both parties agree in giving a construction to their contract, shall either be at liberty to first enjoy the advantages of that construction and then repudiate it and recover upon one entirely different ? Such license would not be allowed if the action were between man and man; should it be allowed in a court which treats the government as though it were a citizen and subjects it to the same liabilities ?
Now in this casé it appears that at the timfe the claimant accepted the office there were and had been two classes of consulates. The one *161 office bore a fixed salary, which was for all services, and also for all expenses. There were also certain diplomatic and judicial duties attached. It required the entire time of the consul, and prohibited him from enjoying the advantages of private business; and it obliged him to remit the fees which he collected to his government. The other of these offices gave to the consul whatever fees he might collect up to a certain amount; it imposed upon him mere commercial duties; it obliged the government to pay to him the necessary expenses of his office, and it allowed him to engage in business and traffic. This was the office which the defendants, as we find evidenced by the steady, uniform concurrent action of Congress and the Department of State, supposed they were bestowing upon the claimant; and this was the office which we find as a matter of fact the claimant accepted and enjoyed. What he now seeks to do is to acquire the profits of the other office, and thus to enjoy the benefits of both. He does not offer to restore the expenses of his office, which the defendants have actually paid him. He does not account for the fees which he received, or might have received, nor negative the presumption that he did receive them. He does not aver that he never engaged in trade or traffic, and his doing so was an enjoyment which he could not restore if he would. The claimant has, therefore, in the strongest and most unequivocal manner, placed upon his contract of office the same construction which the defendants placed upon it. If the case presented only the failure of Congress to appropriate for a salary escablished by law, an erroneous construction given to the law by an executive department, and the enforced acquiescence of a public officer having no means to test the decision of his official superior, we might follow the ruling in the Graham case; but as it is, we think the acts of the parties have a much deeper significance, and bring the case within the rule of a contemporary construction given mutually by the parties which a court is bound to enforce, even though it might otherwise have'adopted one widely different.
These offices of consul, moreover, are not always established or regulated by statutory law. There have been consuls appointed by the President and confirmed by the Senate before there was any act of Congress authorizing their appointment.. (See 7 Attorneys General's Opinions, p. 249.) And their existence as well as their powers and duties often rest upon what the Supreme Court has termed the “ discretion” of one “ of the great departments of the government.” The words of that court are as applicable to the Secretary of State in the appointments and regulations of consuls as to the case there decided, *162 wherein it is said: “He is limited in the exercise of his powers by the law; hut it does not follow that he must show a statutory provision for everything he does.” United States v. McDaniel, 7 Peters, p. 14. The act of 1792 (1 Stat. L., p. 254) also contains a declaratory clause which Attorney General Cushing asserts “is to he understood as implied in all other acts of Congress. (7 Attorneys General’s Opinions, 249.) It is as follows :
“ The specification of certain powers and duties herein to be exercised or performed by the consuls and vice-consuls (or other consular officers) of the United States shall not he construed to the exclusion of others resulting from the nature of their appointments or any treaty or convention under which they may act.” (Sec. 9.)
The Secretary of State has always, exercised unusual and peculiar powers over these officers. He designates their duties, and in many cases even has discretion to fix the amount of their compensation. There is probably no class of public officers who depend so much on the discretion and will of a Secretary as these consular officers. The construction therefore given to this ease of the consul at Algiers by the various Secretaries who have designated his duties and fixed his compensation is entitled to great consideration, and the fact that from the accession of France, in 1830, until the present time, no Secretary has doubted or questioned the legality and reasonableness of the change, lends very strong confirmation to the conclusion which we have reached.
III. And finally we think that the acts of the claimant amount to a clear case of estoppel in pais. That having accepted voluntarily a consulate of the one class, and that having received and enjoyed its emoluments and advantages without objection or protest, he cannot go back and endeavor now to acquire the profits and advantages of the •other office; still less that he can legally acquire the profits and advantage of both ; still less that he can recover in this court when the same proof would convict him of having violated the very statute which he makes the groundwork of his action.
The judgment of the court is that the petition be dismissed.